The next case on the calendar is Schwartz v. Tatad, and it's not about mortgages. And you are appearing as part of the pro bono program, are you? Yes, Your Honor. Well, thank you very much for doing that. Of course. May it please the Court. This case comes before this Court in a summary judgment posture, where the only question is whether there are disputed issues of material fact. The record construed in the light most favorable to Mr. Schwartz shows that he waited over a year to obtain an ablation procedure that the records indicate was medically necessary to treat his symptoms. During that delay, Mr. Schwartz suffered unnecessarily from worsening and recurring symptoms associated with his thyroid issues. In addition, for nearly a year, Mr. Schwartz was denied access to treatment by a qualifying specialist for his kidney condition. There are no facts in the record, and certainly no undisputed facts, providing an explanation or a justification for either of these delays. Mr. Schwartz is entitled to present his claims to a jury who may evaluate the credibility of his testimony and the weight of the evidence. I'd like to focus the balance of my time on the summary judgment issues, discuss the dismissed defendants if time permits. Summary judgment here was inappropriate with respect to both Dr. Longfellow and Ms. Tattad. With respect to Dr. Tattad- Excuse me, counsel. I'm over here, sorry. If you wouldn't mind concentrating in particular on Dr. Longfellow, it seemed to me that the facts, just speaking for myself, that the facts regarding Ms. Tattad are very strongly in your client's favor. But I had some difficulty understanding your best argument as to why Longfellow wasn't merely negligent rather than meeting the higher standard. The best argument by Blackboard, why there is sufficient evidence from which a jury could conclude that Dr. Longfellow was deliberately indifferent, is that by May of 2013, Mr. Schwartz's treating physicians as well as his non-treating physician, Dr. Longfellow, all agreed that the only appropriate course of treatment for Mr. Schwartz's thyroid condition was the ablation. This is not like, for example, the Sanchez case that the defendants cite here where there's just a disagreement about what treatment is appropriate. But at that point, it appears that Dr. Longfellow removed the ablation, right? Then it didn't happen for a couple of months. We don't know why that was. Right. That's blank. And what this court has said in— Well, just a minute. Oh, I'm sorry, Your Honor. And then it was reordered, apparently because of some technical reason. We don't know exactly why that is. And then it happened two months after that.  That's correct, Your Honor. So, essentially, it took four months to happen, but we don't know that Dr. Longfellow was responsible for any of those four months, do we? He ordered it. Well, what I would— Do we know what happens next under their procedures? I would say two things. Well, we don't know, Your Honor, and that's precisely the problem here. There's so many things we don't know. Dr. Longfellow put in an affidavit— Well, what do we know that Dr. Longfellow should have done and didn't do and was deliberately indifferent in not doing? Well, we know under this Court's precedence, and I would direct the Court to Snow v. McDaniel, for example, that if there's a supervisor who knows that a subordinate, in this case Dr. Ash or whoever is responsible for ensuring that these procedures are carried out in a timely fashion, is providing constitutionally deficient care to a patient and fails to take action, that is sufficient— I mean, do we even know that this is an unusual delay in terms of how the outside world operates? I mean, we all have enough experience with medical care to know that even when serious things are happening, it takes time to get things done. Certainly, Your Honor. And we're not asking this Court, for example, to draw a bright line that says four months is too long or one week is too long. But we do think that this case in particular fits comfortably within this Court's prior experience. I'm not sure how comfortable I am. So going back to Snow, we have Snow in your comment about what the law is vis-à-vis supervisor liability. Correct. We also have Peralta more recently with the en banc decision with a very different result. And you said that the key is whether the supervisor knows that the other co-worker, the subordinate co-worker, is, for lack of a better word, providing constitutionally inadequate care. So how would Dr. Longfellow know that? Well, we know, for example, certainly by the time he approves the ablation the second time. Which is the date? Forgive me. I have a timeline. If you could tell me just a month. The second time is when? Yes. So the ablation is originally approved on May 10, 2013. The second approval is June 27. I see it. So by then we know what? We know at least by then that Dr. Longfellow knows that there's been, by that point, not just a month-and-a-half delay from when he approved it, but a two-and-a-half-month delay from when it was originally deemed by Dr. Ash to be medically necessary. So she requested in April. Dr. Longfellow doesn't approve it for another month. And then a month-and-a-half later it is re-requested. So we know for certain at this stage that he's aware that there's a two-and-a-half-month delay. It's also the case, as I understand it, that this delay was not ultimately detrimental to his health. So what you're focusing on was his condition during those four months, right? In other words, as I understand what happened, the ablation did, in fact, solve the problem. And it wouldn't have solved it any better or worse from anything that we've been told if it had been four months earlier. So the problem is the four months. That's correct, Your Honor. And what the record shows with respect to that four-month gap is not just that Mr. Schwartz's symptoms with respect to his thyroid issue were continuing. They were actually getting worse. And there's a powerful quote that the government puts in, actually. This is at S.E.R. 428. This is just days before the ablation where Mr. Schwartz sees Dr. de Guzman at the prison, and Dr. de Guzman explains to him, you need to have this procedure. And what's that date, sorry? This happens on September 6, 2013. Okay. And Dr. de Guzman tells him, you need to have this procedure because the thyroid condition is affecting your entire body. It's affecting your cardiovascular system. This is an important procedure. And he notes in the record, worsening hyperthyroidism. So it's not just that the symptoms are continuing during this delay, it's that they're actually getting worse during this time period. Okay, so then in November of 2013, opposing counsel submitted in the excerpt indication that he saw a specialist at University of Arizona. That's correct. And that's after the ablation has now taken place. So, you know, what we focus on, I think, this line of questioning started with... Just initial evaluation of hypothyroidism, though. I think the timeline is kind of hard to decipher. It's certainly complex. The November 2013 evaluation was not the first time Mr. Schwartz had seen an outside specialist. It was the first time he'd seen that particular outside specialist. Well, and I think that one of the things that was, just speaking for myself, was really striking to me from this record, unlike other Eighth Amendment kinds of cases that we see, this person received a lot of care. Yes, Mr. Schwartz did receive care in his deposition and in his complaint. He explains that he is not alleging that there was a complete lack of care. What's your strongest argument, then, for delay? What's your very strongest argument? The very strongest argument is the four-month delay. We know that the record shows that there's not disagreement. Counsel, between X and Y, between when and when? Between when the ablation was first requested, which occurs April 19, 2013, and when it's carried out on September 11, 2013. Okay. And, Doctor, going back to all the way, if you would, back to Judge Graber's question. Yes. You think that that delay caused your client harm and maybe even worsening of his condition, and that Dr. Longfellow was deliberately indifferent to that because he knew what? He knew that this procedure was medically necessary to treat Mr. Schwartz's condition. So we don't have a disagreement, a medical opinion. Did he know with any specificity what his level of discomfort was? Well, we know from the- He had never actually seen him, right? Well, Dr. Longfellow, though, was in receipt of the report from January 23, indicating Mr. Schwartz's hyperthyroidism. So he knew what the issue was. Right, but did he know? What I'm having a little difficulty with is whether his physical condition during that period was sufficient to- It wasn't pain, exactly, right? Pain is one thing. This wasn't pain. Did this itself reach the threshold of- of a medical condition that would give rise to a cruel and unusual punishment claim just by itself? It would, Your Honor. So let's strip away- And did the doctor know that? Right, so let's- He knew he had hyperthyroidism, but did he know what his actual condition was in a way that let him to know that this had to be done quickly as opposed to done? Well, we know in- So to answer the first question, was this a serious medical issue, first off, the defendants had never disputed that there was a serious medical issue. The district court found- Well, there clearly wasn't that it had to be fixed, because if it wasn't fixed, bad things could happen. But I'm isolating the condition as it manifested itself, since it was solved by easing the delayed ablation. What symptoms was he reporting? Well, so what Mr.- The symptoms that Mr. Schwartz was reporting throughout this time period, they include stroke-like symptoms. They include loss of control of bowel movement. Which had happened three times? It happened, I think, at least twice that we pointed to in the record. During that time, he was shaky. What else? He was shaky. We know that he also had tachycardia, which is quickening of the heartbeat, which we also know is associated with these thyroid issues. And did Dr. Longfellow know those details, or did he just know that he had hyperthyroidism? We know that they're all documented here, and we know that the request to conduct the ablation was submitted to Dr. Longfellow. But did it say hyperthyroidism, or did it say- I mean, did he know that during this time period all these things were still happening? Well, again, we know, at least as of January 23rd, that Dr. Longfellow was aware that these issues were related to hyperthyroidism. And in that report that comes from an outside specialist, it documents at least some of the symptoms that Mr. Schwartz was suffering up until that time period. We also know from this Court's prior cases and Snovee McDaniel, I think, in particular, that once you have a course of information being filtered up to a supervisor, it's particularly where this supervisor is, if it's a physician, who's making a determination about the course of treatment, I think the jury could certainly infer that Dr. Longfellow is not just signing these things to the line list. Let's at least have some awareness. Sure, and he also has to triage. Counsel, there's no responding of superior liability in this context. There is not. So, and Longfellow never treated your client, I don't believe, personally. So, I guess I still am having difficulty seeing that the course of conduct was beyond negligence, if even that, since we don't really know what the normal delay would be between a recommendation and a procedure of this kind. But I guess you've given us your best shot at why you think it's beyond negligence. Can I probe you a little further? Because what you just said threw me off. If he, Longfellow, who was not a treater, he has to know that someone else, and in this case I think it would be, can you pronounce her name, Tataad? Tataad. Tataad was providing constitutionally inadequate care, but what you just mentioned for these symptoms, you indicated that these are symptoms that she had recorded, or somebody had. They were in the record, so Longfellow would have seen them? Well, so there's two different issues here. I think with respect to Dr. Longfellow, the question is, what knowledge does he have that Mr. Schwartz is suffering from serious and recurrent symptoms? Right, and he's not a treater, so it can't be that Mr. Schwartz is complaining directly to him. He has to be looking at the record, doesn't he? Right, that's correct. And so I take your question to be about our claims with respect to Ms. Tataad, that she's failing to record his symptoms. Well, it is sort of a turducken problem. That has to be baked in because there isn't direct response against the superior. He has to know or have reason to know that this is constitutionally inadequate care, I think, is your theory, right? He does have to know that it's constitutionally inadequate care. I don't think that he has to, that we have to, for example, impute the liability of Ms. Tataad. No, I appreciate that. I appreciate that. Go ahead. The Peralta case where, I mean, aside from the question of resources, there is some language about the supervisors didn't know enough about the dental care to know that it was wanted, et cetera. Yeah, and I do think it's a factual question. This Court said in the Lollibee County of Orange case that oftentimes you're not going to have direct smoking gun evidence of knowledge. You're going to be relying on circumstantial evidence. And that's a fact question. But the circumstantial evidence here is that Longfellow is sitting up here. I mean, he is told that this person has hyperthyroidism and that his doctors are suggesting that he have an ablation, and he says, okay. But what does that prove about what he knew about his day-to-day functioning during the relevant time period? Again, if we're looking back at the January hyperthyroid report, it itself contains recitation, which, again, this is an outside specialist that we're talking about. It itself contains evidence about Mr. Schwartz's symptoms. By the time he goes to the outside specialist in January of 2013, he's already had two very violent episodes in the prison that are recorded in the record. And, again, if we're looking specifically at- In that record, the January request? Yes, in the January 2013 thyroid. And if I can direct the court to that, that is at- Excuse me. That is at ER-127. To Judge Kristen's question about Ms. Titot, if I may, I think it's important to- They really are distinct in some ways, and I appreciate the urge to understand how they fit together, though. The problem with Ms. Titot is that the symptoms start manifesting themselves in September of 2012. He has an episode that's recorded in the record on September 9th. He has another episode that's recorded in the record in early October. The problem is we know that those aren't the only two episodes. And then lab tests are ordered, I think, the 11th and 12th, right in there. Going back to Judge Berzon's point, I don't know where those lab tests go. I don't know if they went to Dr. Longfellow, or we don't know much about this, or the paper trail, right? And we're not saying that Dr. Longfellow was responsible at that moment in time, precisely for the reason you pointed out. We know that there were tests run. But what we do know is that Mr. Schwartz was continuing to suffer from these stroke-like symptoms. He was continuing to present himself to Ms. Titot at sick call, and she was simply refusing to not just see him but even record the fact of his visit. She kept saying, watch the call-out. Does that mean he's already on a waiting list to see a care provider? I don't know what that means. That is the suggestion made by that statement. We don't know if that's actually the case. What eventually happened was Mr. Schwartz himself filed a request with the prison saying, I need to be seen, and they said, you're on the call-out. We don't know if he was on the call-out before that or they added it to him at that time. There's also an allegation in the complaint that she took him off sick calls, the physical location, right, that she took him off the call-out. Right. Which I take it to be a list. Was she deposed? Is there anything other than that allegation in the complaint? Ms. Titot was not deposed. Mr. Schwartz was deposed, as you know, and he did testify I think in pretty good detail about not just the circumstances with Ms. Titot but also the particular time frame in which these issues were arising. And why this all matters is because we know that Mr. Schwartz was not seen by a physician at all until November 29th. The complaint doesn't tell me when he alleged she took him off the list. What is the record about that? I don't think we have a clear record on the taking off the list, but I don't think that that is a fact that this court needs to sort out in order to rule in our favor. I think the fact that he's presenting symptoms and, you know, when Dr. Adkins finally sees him on November 29th, she has an incomplete record of this patient's serious medical issues. And, you know, we can't say. We don't know what would have happened if Dr. Adkins knew at this time that this wasn't two isolated incidents. It was serious and recurring. It was every week, but she doesn't have the access to that information. And then from then on, it's another 10 months before he finally gets the treatment. Let's move briefly to the Longfellow timeline. When did Longfellow approve the ablation? I'm sorry, Your Honor? When did Longfellow approve? You keep talking about some January date. After some January date, he knew this. What, January what? The January 23rd date is when there is a thyroid scan by an outside provider. That's an outside person? That's an outside provider, and the recipient on the thyroid scan is Dr. Longfellow. It says Dr. Adkins reviews the thyroid scan, but Dr. Longfellow gets it. But do we know he looked at it? Do we know he should have looked at it? Well, we don't know whether he looked at it, but I think if, again, if we're working under the Lolly framework of what inferences can a jury draw, I think a jury could infer that if he received a report saying one of his ‑‑ that he sent it to his doctor, Dr. Adkins, because on the 25th, Dr. Adkins reviewed it. Well, we know that Dr. Adkins reviewed it. We don't know whether Dr. Longfellow looked at it. Can I just add, you're well over your time, and I appreciate it, but I have one question about the dismissed defendants. And assuming that we agree that there is authority that you should have been given ‑‑ have you told us anywhere what an amendment might look like that would matter? I think what we point to in our brief is the evidence that's been developed in the course of discovery here. So we have now not just allegations, but we have evidence of these specific instances. We have e-mails, for example, between Mr. Schwartz and the warden telling him, I'm not getting treated, I'm not being seen by doctors, my symptoms are getting worse. We have deposition testimony from Mr. Schwartz recounting those same interactions. We have medical records that show his course of treatment as between Dr. Adkins and Dr. Ashe. So there's plenty of evidence. Dr. Adkins and Dr. Ashe in some ways seem like the heroines here. Well, I mean, obviously there's going to be a judgment if we ‑‑ if this is reversed with instructions to release. I mean, they're the two people who got anything going that got going. I mean, I think if we, you know, as I read the record, I think Dr. de Guzman is the one that I would hold out as someone who ‑‑ Dr. whom, sorry? Dr. de Guzman, and he doesn't feature as often, but he is, you know, I guess he was not named as a defendant. And certainly there would be a strategic question if we were to amend whether, you know, it would make it for a more coherent story to exclude those defendants. But as far as the allegations of the complaint go, we think they're sufficient on their face, but there's certainly enough in the record if we needed to flesh that out more. All right. Thank you very much. Thank you. We'll give you one minute in rebuttal. Okay. Yes, ma'am, please. May it please the Court, my name is Kate Foss, and I represent defendants Dr. Thomas Longfellow and Ms. Ophelia Tatad. The importance of ‑‑ And not to dismiss defendants. Not to dismiss defendants, that's correct. The United States, putting on my hat for a moment, is of the opinion that there's no jurisdiction over those defendants. That part I don't understand, because there was an appeal from the final judgment, and there couldn't have been an appeal earlier, right? That's correct. So it was wrapped into the final judgment, and part of what was appealed was the final judgment. Plaintiff specifically in his notice of appeal ‑‑ Said summary judgment and final ‑‑ And said the summary judgment. And the judgment, and the judgment. And, well, that judgment was the one entering in the summary judgment, but then also in his own opening brief only mentioned his claims against those defendants, and there's no reason that any of these people who have never been parties have never been served and wouldn't be involved. That's the way the statute is written. That happens all the time here. Anyway, go ahead. Well, and as a ‑‑ One last note on that is that also regardless of your question asking about how the amendment would happen, it was also a dismissal without prejudice. So just a question on that front. In any event, the critical issue for defendants in this case is that this is not a medical malpractice case. It is an Eighth Amendment case, and that's dealing with cruel and unusual punishment. And the question here is whether either of these defendants have made a conscious disregard of the substantial risk of ‑‑ Well, counsel, it seems to me ‑‑ Excuse me. It seems to me with respect to Ms. Tata, as the allegations are now, whether they prove true is a different matter. But it seems to me quite significant that there are allegations that she turned him away, that she failed to record his coming in, that she failed to record his symptoms, which are quite significant, that she didn't send him to a doctor even though he had these difficult experiences. So at least with respect to her, why isn't that a potential Eighth Amendment claim? The biggest issue with Mr. Todd, Your Honor, is that regardless, even if you're assuming that all of these actions took place, there's no evidence that that caused Mr. Schwartz harm. During this time ‑‑ Well, the harm was that during this time, he's walking around having what he describes as strokes, collapsing, feeling, just having severe, he's calling thyroid something. Storms. And so on. But just ongoing symptoms during that delay period. That's the allegation. During the various delay periods. Well, Your Honor, during that time, the medical records don't bear out. Then he says she wasn't keeping the medical records. That's the problem. Exactly. That's the exact problem, because his allegation is that the medical records were deliberately incomplete because she was dismissive of his complaints. So pointing to the incomplete medical records, in a sense, strengthens the plaintiff's case. It doesn't weaken it, it seems to me. It's not that the medical records are incomplete. It's that the medical records looking at plaintiff's objective symptoms show him as, in that initial September visit, that plaintiff points out as the first time he's allegedly having this thyroid storm, which is, again, not a medical test. Exactly. I mean, it was proved out that he really did have a serious problem. He had a serious problem, but there's no evidence that it was a thyroid storm, as he's put no record evidence in there. But regardless, in September, he goes to see a nurse. They take a look at his symptoms. They check his vitals. The only thing he complains of is that in recreation he was feeling lightheaded and dizzy. They find no apparent findings, no distress. Vital signs are all normal. They check his blood sugar, indicating they think maybe it's a hypoglycemia issue, which is something that he had previously suffered from. The next month, he sees Ms. Titad, and similarly she says no real defined issues as she's checking him out on his vitals. She again checks blood sugar. I'll give you that. That's the first month. And then she orders some labs, right? Right then. Correct. So then it starts to get dicey. If you could focus on that. I don't know where those labs went or if there was any follow-up. He says he kept reporting, and as Judge Graber has mentioned, he alleges she didn't write down all of his visits back to sick call. So what about that period? During that time, plaintiffs allege she's telling him, watch the call-outs, watch the call-outs. I'm sorry. Nobody defines call-out. Is that a list of where the guards are going to take you out of your cell and take you to some place? There's essentially a list posted, I think, in the mornings to say that you have an appointment. But in fact, he never did. He never did get an appointment until he specifically made a complaint about not getting it. He never did get an appointment as a result of whatever she was doing. Instead, in mid-November, he made a request to the staff complaining about serious medical issues, no follow-up on symptoms, and then he was finally placed on a schedule and saw Dr. Atkins. But not as a result of her doing that. Well, Your Honor, there's no evidence that he wasn't on the schedule prior to that time. Can I back up even a step before that? Does she have the ability to put him on a schedule? Does she have the ability to give him an appointment? Is that what she's doing? Or does that go to an M.D. or somebody who triages and decides whether to give him an appointment? We can't even tell that, really. The medical labs that she requested in October are indicated that they are to be reviewed by Dr. Atkins. Okay, so what I'm asking is a different question. It's important vis-a-vis Judge Berzon's question. During this period of time where he says he's coming back and she's saying watch the call-outs, watch the call-outs, and I get that that's a list that he's going to be called out to if he has an appointment. My question is, did she have the ability to make an appointment for him, to put him in line, or is there some other M.D. or some other care provider who's going to triage and decide whether he gets an appointment? My understanding is that Mr. Schwartz's primary care physician, who at this time was Dr. Atkins, would be responsible for making that appointment. He never saw her. But how would that come about if, in fact, we have to take this as true right now. He says twice a week, between October and December, I went to sick call. None of this was recorded. He was talking about these sort of stroke-like symptoms and blood in the urine and all kinds of other really distressing and painful problems. And why isn't that enough for our purposes to indicate that Dr. Atkins, if she looked at the records, would see nothing because nothing was recorded? It's circular, it seems to me. So why isn't that enough with respect to Ms. Titon? Well, Your Honor, plaintiff's lab results that were done in October would have been they were sent, at least, to be reviewed by Dr. Atkins, which would also include his records during that October time. Well, according to what I see here, and I don't know whether Dr. Atkins, it appears that she may never have looked at them because Dr. Longfellow saw those labs in January, but she ordered labs when she saw him at the end of November and then reviewed them in early December. So there's no indication that she ever did see those earlier labs. I thought her notes did say that the lab test had documented in October the presence of blood in the urine. I may be wrong about that. I guess it's just unclear when she's making that, when the lab tests reach her and she's interpreting them. And I agree, it is unclear at what point she sees that. There is an indication in the December notes that, talking about the urine, and even in those October lab tests, Ms. Titon notes that he has other labs scheduled for November 2012. So even in October he's already got that lab set schedule as well as his chronic care appointment. So are you interpreting this record to mean that the lab test that was ordered by Ms. Titon went to Dr. Atkins and that it was up to Dr. Atkins to decide whether or not an appointment was needed and that she decided one wasn't and that's why he's not on callout? Is that what you mean when you say that Titon kept saying, watch the callouts? As opposed to Titon having the ability to make an appointment for him and saying, watch the callouts. My understanding is that Ms. Titon assigned him to watch the callouts, assuming that that's what was occurring, because he had scheduled appointments coming up. And from her own experience, that would have been... This is important to me. Would that have been because Titon scheduled an appointment for him or because Dr. Atkins perhaps is the one who's supposed to be scheduling and doesn't feel the need to see him? Is that your position? I'm trying to figure out what your position is. I'm not aware of whether Ms. Titon or Dr. Atkins saw those October lab results. Okay. And that's part of the issue of deliberate indifference. There isn't an indication that she saw this and she knew and she deliberately didn't schedule him, didn't have him set up with a physician. It's that she saw him in October and she sees a pretty ordinary guy. His vital signs, there's nothing exceptional. Was blood in his urine? Well, there's no indication that she saw those lab results. But he said he had blood in his urine. That's not in the medical records. It's not in the medical records? And he keeps coming back and he says that she didn't write down all of his subsequent complaints. And his allegation today is, right, that that may have made a difference to Dr. Atkins, for example, if she'd realized that he kept persisting in his complaints. At most, that's a one-month delay in time where a plaintiff can have to show that he's sick. During that time, does he evidence symptoms that include losing control of his bowels or having these stroke-like symptoms, fibroid storms? Isn't that happening during this time? He alleges that there was an incident when he sees Ms. Titon in October where one time he wasn't able to use the visitor's restroom and he lost control of his bowels. But during this time, he's not suffering any pain by his own admission multiple times across this. And even in his deposition, he says, you know, we weren't really sure what they were dealing with when he was talking with Dr. Atkins at the end of November. Rather than this being there was a deliberate choice where she knew about it, the plaintiff focused on these sort of objectively serious symptoms. Well, under the Eighth Amendment, it not only has to be objectively serious, but she actually has to make that inference that there's a substantial risk. When was the period that she was telling him to drink more water and do exercise? Well, drinking more water is actually a pretty vitally important thing if you have kidney issues. All right, but when was that? I understand that to be from January to March, which is a period. All right, and by that time, she knew he had problems. Right, and that. And he's coming in, he says frequently, and he says she's not recording it again. And she's telling him to drink water and do exercise when, in fact, he is. There are strong indications by then that he does have kidney problems and he does have thyroid problems. Right. And during that time in that January through March period, he's seen 18 different times by medical providers. So if there are times that he's alleging that he's coming in, they're not very far off from when he is actually having appointments and being seen by. He saw a lot of care. It's unusual in that way. It's also unusual because some of the time he says he's not in pain. But there's also these entries that indicate, and we're not medical experts, and that's going to be a whole other issue whether he's going to be a medical expert for sure. But some of the entries are very eye-popping, right, and concerning. He's losing control of his bowels at least three times, I think one time in sick call, and then he was describing really pronounced blood in his urine. He lost a large amount of weight. He did over a fairly long time in May 2012 when he wasn't having any complaints, wasn't having any issues. He weighed about 155 pounds, and then he lost about 15 pounds during that time. But regardless, it has to be shown that Mr. Todd knew about this and consciously disregarded that choice. Okay, so what about the allegation? Forgive me for interrupting, please, but what about the allegation that in the complaint that she took him off of a call-out list? What about that? In the complaint he alleges that she threatened to take him off of the sick call list. No, he said she didn't. No, he said she didn't. But in his declaration, I apologize, in his declaration then he indicates that she threatened to take him off the list but didn't actually provide any evidence of when that was or if it actually happened. He said it happened. And given that he saw the physicians 18 times during that period. He said it happened, and he said he saw her do it. That's his evidence. It may be disproven, but it's precipient evidence. Is there a discrepancy between the complaint and his declaration? Is that what you're telling me? There is a discrepancy between them. Okay, could you give me the two ER sites because I've got the complaint. I'll check myself, but if you could. Okay. Well, wait a minute. Is there more than one declaration, or do I just need to read this declaration? I believe there's only one declaration. Okay, I've got both right here, and I thought I read them both. And I've got the one from the deposition and I thought that's where he said it. The deposition, I believe, he says, and there's I think a variety nested here that he says that someone. Was the complaint pro se? Yes. That someone who he doesn't identify told him that this, that Mrs. Todd had told her, but that's not evidence sufficient to create a material issue of fact because he doesn't have that person as an affiant. He doesn't have anything other than his own say so of non-record evidence. Okay, so if ER 18, and I don't know why I couldn't find it earlier because I have it highlighted here, sorry, but he says she then deleted my name from the sick call. And I believe when he actually got down to his declaration and his deposition testimony, it was clarified that she had threatened to do so, but there's no indication that he actually would have removed her. And especially given that during this time period, he's being seen over and over and over again, it's hard to say even if she had deleted him from the sick call, how any harm would have resulted from that. Okay. Well, the harm was that he wouldn't have gotten called. Well, but he was called. He was called in some cases day after day throughout this period, January through March, seen 18 times, which is certainly far higher than most medical care in the private sector. Not to mention that during this time, the medical results that the team is doing, they're somewhat confusing. He's complaining about these litany of issues, but then they go in. He has normal EKGs. He's got normal heart rate. He has normal urinalysis. Well, that's not at all consistent with what the EKG and so on, because his testimony is episodic, not that it's every minute. But in that, when they're faced with someone who's coming in and they're saying he's having these issues, but then he's saying he's having blood in the urine, they test the urine. I thought they did find blood in the urine. Pardon? I thought they did consistently find blood in the urine. At times they found blood in his urine, which was diagnosed by his urinologist as being solely due to his kidney stones, which is something that even that urologist just said, these are kidney stones, let's test, make sure he doesn't have any other conditions, which he didn't. And that hematuria was due to his non-obstructing kidney stones, which have to pass as they go. Counsel, in SCR 11, which is your motion for summary judgment, it says, according to him, she removed his name from sick call. So doesn't that mean you have to be able to show that he doesn't have a viable allegation that delay caused him harm? And I get that has to rise to the level of deliberate indifference, but you are acknowledging here in your motion that he's alleged that she removed his name from sick call. I agree, and though this was our motion for summary judgment, in which case his declaration was in response to the same, just discussing his allegations and the complaint. Sure. So your position in district court was there was no really, really wasn't a material issue of fact about this, even though you said he's alleging it? What was your position? There's no genuine issue of material fact, both because he doesn't actually have evidence that she did so, as the district court pointed out, but also because there's no harm, especially given his repeat and consistent treatment during that period. Okay. All right. Thank you very much. Thank you for your patience. Yes. And we will give you one minute. Thank you. Two brief points for the court. First, with respect to Ms. Chautaud, the question is not whether she knew as of October or November of 2012 that Mr. Schwartz was suffering from serious thyroid problems. The point is that she knew, or at least there is evidence from which a jury could infer, that she knew he was suffering from recurrent serious stroke-like symptoms, serious weight loss, loss of bowels on numerous occasions. Is that the main period where we should be focusing on with respect to Ms. Chautaud going January to March? I think also January to March, because what the record shows is while he is being seen by some mixture of physicians and nurses, he's not receiving treatment for his thyroid issue, and he actually has to affirmatively approach Dr. Atkins, or excuse me, Dr. Ash at an open house and say, nothing is being done to treat me. And that is when Dr. Ash looks at the record and says, okay, we need to get this patient an ablation for his serious thyroid problems. But he was at that point the patient of Dr. Atkins. Is that not accurate? I think that it's fluid in the prison. He doesn't have one treating physician for his thyroid issues. And that's the problem with Ms. Chautaud. She is the gatekeeper. She is the avenue through which Mr. Schwartz has access to medical care. And what this court said in the Hunt case is that if a patient doesn't have the ability to report symptoms, that itself is sufficient evidence. And that was the period that he says she took him off sick leave once. The second period. I don't think, you know, to be, I think it's unclear precisely when he was taken off sick leave. I think what is clear is that he alleges that during both the fall or excuse me, the winter of 2012 and then the early months of 2013, he was being turned away. He's being told to drink water and exercise more, which I agree are great things for patients to do, but there are no treatment for a serious and recurring thyroid problem. And I would just ask this court, if it counsel just presents, giving you a lot of time, can you give me in one sentence, what's your strongest case against Dr. Longfellow strongest case against Dr. Longfellow comes from Snobby McDaniel. And what that case says, I know what the case says factually, which timeframe is, is from April, 2013 to September. Because you think in during that period of time, Dr. Longfellow knew what he knew that Mr. Schwartz had serious and recurring problems associated with his thyroid. And he knew that the only treatment appropriate for those symptoms was the ablation. He knew both of those. And he didn't do what, what's the requisite. He didn't order something. He didn't, he did not take action to ensure for issues that he was aware of that his There were two instances in which he disapproved treatment, but you're not concentrating on that. Yes, there is also the denial of treatment with Dr. Chavez, which I'm happy to talk about. I know well over time, the best case is the April to September, but I think entirely independent ground for reversing here is that he defied the instructions of a treating physician. And we've heard from defendants from Dr. Longfellow himself. He's not a treating physician. This court has said that is sufficient to, to take the issue to a jury. But your position isn't that he has to rubber stamp. No, no, he doesn't. And I think the bottom line is that there are facts from which a jury could infer that there was. Okay. Thank you very much. The case of Schwartz versus Todd is submitted and we'll go to the last case of the day, which is Bob Ra versus city of San Bernardino.
judges: Graber, Berzon, Christen